386 A.2d 154

**COMMONWEALTH of Pennsylvania**

v.

**Susan NOVEROSKE, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 23, 1977.

Decided April 28, 1978.

Stephen P. Swem and Lester G. Nauhaus, Assistant Public Defenders, Pittsburgh, for appellant.

Robert L. Eberhardt, Assistant District Attorney, and Robert E. Colville, District Attorney, Pittsburgh, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PER CURIAM:

Following the filing of a criminal complaint, appellant was arrested on July 9, 1976, and charged with one count of acquisition or obtaining possession of a controlled substance

by misrepresentation, fraud, forgery, deception or subterfuge [1] and one count of tampering with public records.[2] On October 16, 1976, appellant was found guilty on both counts in a non-jury trial. Post-verdict motions were filed and denied. Appellant received a suspended sentence and was released on probation for one year. The only question on appeal is whether the evidence at trial was sufficient to convict her on either count.

The lengthy facts pertinent to this appeal involve an incident on June 17, 1976, when the appellant was assigned to the Intensive Care Unit at Pittsburgh Hospital through a medical personnel pool (an agency supplying temporary nursing personnel to hospitals and nursing homes). Appellant was responsible for the care of three patients: Jenny Sylvester, a patient of Dr. Friday in Room 2; Ronald Garret, a patient of Dr. Samadami in Room 1; and another patient.

Ms. Barbara Leon, the Commonwealth's main witness, was the registered nurse in charge of the ICU that day. Ms. Leon checked the narcotics supply at 3:00 p. m.—the end of a shift—and discovered 500 m. g. of demoral missing, and not accounted for.

Jenny Sylvester's medication card authorized that she be given 25 m. g. of demoral mixed with 25 m. g. of vistaril every 3 to 4 hours as needed. The narcotics' record showed 50 m. g. of demoral administered at 8:00 a. m., 11:30 a. m., and 4:20 p. m. on June 17. There is testimony that it is common hospital practice that if a patient is to receive 25 m. g. of demoral, a 50 m. g. syringe must be used because it is the smallest dosage available, and 25 m. g. from the syringe is destroyed by shooting it down the sink. However, the patient is charged for the 50 m. g. amount on the narcotic's record.

Commonwealth's exhibits number 3 and 4 were narcotics' records. Number 4 specifically stated that Ms. Sylvester in

1. Act of April 14, 1972, P.L. 233, No. 64, § 13; 35 P.S. § 780–113.

2. Act of December 6, 1972, P.L. 1482, No. 334, § 1; 18 C.P.S.A. § 4911(a)(1).

Room 2, the patient of Dr. Friday, was dispensed 50 m. g. of demoral at 11:30 a. m. This was signed by appellant. Exhibit 3 recorded Ms. Sylvester as being in Room 1, the patient of Dr. Samadami, and having received 100 m. g. of demoral at 11:30 a. m. This too, was signed by appellant. Mr. Garret was actually in Room 1, the patient of Dr. Samadami's and also under the care of appellant.

At the trial, appellant testified on her own behalf, and explained the discrepancies between exhibits 3 and 4. She testified that she did in fact make the 100 m. g. notation on the patients' narcotics' record; however, she did not give the dosage to Ms. Sylvester. Appellant related that she mistakenly removed a 100 m. g. syringe from the narcotics cabinet for the 11:30 injection. After she had squirted 50 m. g. of it down the drain, she mixed in the 25 m. g. of vistaril. However, she then realized her mistake, and because the other drug was already mixed in, the demoral syringe could not be replaced in the cabinet. She testified that she then squirted the whole amount down the sink. After securing a 50 m. g. syringe from the cabinet and mixing the proper 25—25 m. g. amount of the two drugs, she gave it to the patient. Later, on the narcotics' chart, she charged Ms. Sylvester with both the 100 m. g. and the 50 m. g. syringes. She testified that the erroneous notation of Ms. Sylvester to Room 1 as a patient of Dr. Samadami was inadvertent. Appellant did not report her error to anyone.

There is further relevant testimony that all the nurses in ICU had access to the keys to the narcotics cabinet, in fact the keys were usually just kept on a shelf. Also, appellant had apparently accepted the ICU duties after her employer told her that administering medications and charting would not be required of her. She claims that she did not feel qualified to do this, but did administer pain medications after the supervisory nurse told her to do so. Finally, it is indicated that there was some confusion in ICU that day because a child was scheduled to be taken off life support equipment, and more people than usual were in the unit.

■ There is no evidence, circumstantial or otherwise, that appellant intended to acquire possession of a controlled substance by misrepresentation, fraud, etc. Of the 500 m. g. of demoral reported missing, the Commonwealth can only connect the appellant with 100 m. g. Even the 100 m. g. were seemingly accounted for by Ms. Noveroski in the testimony involving her own negligence. Jenny Sylvester, rightly or wrongly, was charged for an alleged 100 m. g. mistake. There is, however, undisputed testimony that such was hospital practice, therefore, this should not be evidence of a criminal intent to deceive on appellant's part.

■ Under 18 P.S. 4911(a)(1) *supra*, a tampering with public records or information must be a knowing falsification. Nowhere in the record does the Commonwealth prove that appellant knowingly made a false entry. The most that was proved was that the notation on the narcotic record of Jenny Sylvester was false as to room number and doctor. This falsification could easily be the result of negligence absent any evidence to the contrary.

■ The lower court opinion states that the case turns largely on the credibility of witnesses, and therefore, a finding by the court against the appellant should stand. However, there must be at least enough evidence on which the trial court can base this judgment. Even viewing all the evidence, and reasonable inferences therefrom, in the light most favorable to the verdict winner, it is difficult to perceive where the Commonwealth proved that appellant had committed a crime, much less proved it beyond a reasonable doubt. A conviction can be based on circumstantial evidence, but "if the conviction is based wholly on inferences, suspicion and conjecture, it cannot stand." *Commonwealth v. Long*, 470 Pa. 204, 368 A.2d 265 (1977); *quoting Commonwealth v. Townsend*, 428 Pa. 281, 237 A.2d 192 (1968).

The judgment of the lower court is reversed and the appellant discharged.

PRICE, J., dissents and would affirm on the opinion of the lower court in which VAN der VOORT, J., joins.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.